# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-11-00129-CV

**Heritage on the San Gabriel Homeowners Association; Hutto Citizens Group; Mount Hutto Aware Citizens; Mahlon Arnett; Robbi Arnett; TJFA, L.P.; and Jonah Water S.U.D., Appellants**

**v.**

**Texas Commission on Environmental Quality and Williamson County, Texas, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. D-1-GN-09-001766, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## O P I N I O N

We withdraw the opinion and judgment dated July 31, 2012, and substitute the following opinion and judgment in their place. We deny appellants' motion for rehearing.

Appellants, Heritage on the San Gabriel Homeowners Association, Hutto Citizens Group, Mount Hutto Aware Citizens, Mahlon Arnett, Robbi Arnett, TJFA, L.P., and Jonah Water S.U.D. (collectively, the "Hutto landowners"), challenge the district court's judgment affirming the Texas Commission on Environmental Quality's ("TCEQ") decision to grant a permit to Williamson County to expand its landfill, which is located near Hutto, Texas. In their first four issues on appeal, the Hutto landowners raise issues of both statutory interpretation and substantial evidence. In their fifth issue, they challenge the TCEQ's decision to overturn the administrative-law judges' ("ALJs") recommendation about the expanded landfill's operating hours. The sixth issue concerns the TCEQ's reallocation of the reporting and transcription costs among the

parties, but it has been mooted by the County's decision to bear the costs as the ALJs recommended. With regard to the first four issues, we find that the TCEQ reasonably interpreted the governing statutes and rules and that its order was supported by substantial evidence. But because we find that the TCEQ did not provide the required explanation for overturning the ALJs' recommendation about the landfill's operating hours, we will affirm in part the district court's judgment affirming the TCEQ order and reverse and remand in part.

## BACKGROUND

Williamson County applied to the TCEQ for a permit to expand its existing landfill, which has an estimated life of 25 to 50 years without the expansion.[1] The County is the sole owner of the landfill, which serves the County and surrounding areas. The landfill is a Type 1 municipal solid-waste landfill and has been in operation since 1983. Since 1987, Waste Management of Texas, Inc. ("Waste Management") has operated the landfill under a contract with the County.

The County proposed to change the property area from approximately 202 acres to 575 acres, to increase the waste-disposal footprint from approximately 160 acres to 500 acres, and to vertically expand the existing landfill from 766 feet above mean sea level to approximately 840 feet above mean sea level. The landfill is located in the central part of Williamson County, 1.6 miles north of the municipal limits of Hutto, the nearest community, and between seven and ten miles from Georgetown, Round Rock, Taylor, and Granger.

---

[1] The facts recited herein are taken from the testimony and exhibits admitted at the contested-case hearing.

The TCEQ executive director determined that the County's permit amendment application was administratively complete in May 2005.[2] The TCEQ reviewed the application and declared it technically complete in March 2006. Public notice was given and three public meetings about the application were held in Hutto. In August 2006, the County requested that the TCEQ directly refer the application to the State Office of Administrative Hearings for a contested-case hearing on whether the application complied with all applicable requirements. Two ALJs held a hearing on the merits in August 2007. The County, the executive director of the TCEQ, the Office of Public Interest Counsel, and the Hutto landowners were parties to the contested-case hearing.

After the hearing, in February 2008, the ALJs issued a proposal for decision concluding that the County had met its burden of demonstrating the application's compliance with all applicable statutory and regulatory requirements and recommending that the expansion permit be granted. Although the application had proposed that the landfill operate 24 hours a day, seven days a week, the ALJs recommended authorizing the County to operate the landfill from 5:00 a.m. until 8:00 p.m. Monday through Friday and from 6:00 a.m. until 4:00 p.m. on Saturday. The TCEQ issued an order granting the permit amendment on February 17, 2009. In its final order, it revised the landfill's operating hours, adding 29 operating hours per week during which the County may operate heavy equipment and transport materials to and from the landfill. While the waste-acceptance hours remained the same as those recommended by the ALJs, the TCEQ authorized hours for heavy-equipment operation and materials transportation from 3:00 a.m. until 10:00 p.m. Monday

---

[2] As a result, the TCEQ's rules in effect on December 31, 2005 (before the 2006 revisions), apply to the application. Citations to the Texas Administrative Code are to the version of the code with the effective date of December 2, 2004. We cite to the current version of the government code and the health and safety code for convenience, however, because there have been no intervening amendments that are material to our disposition of this appeal.

through Saturday. After motions for rehearing were filed and overruled by operation of law, the TCEQ issued the permit on May 6, 2009. The Hutto landowners appealed the TCEQ's order to the Travis County District Court. After oral argument, the district court affirmed the TCEQ's order. This appeal followed.

## DISCUSSION

The substantial-evidence standard of the Texas Administrative Procedure Act ("APA") governs our review of the TCEQ's final order. *See* Tex. Gov't Code Ann. § 2001.174 (West 2008). The APA authorizes reversal or remand of an agency's decision that prejudices the appellant's substantial rights because the administrative findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision, (2) exceed the agency's statutory authority, (3) were made through unlawful procedure, (4) are affected by other error of law, or (5) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Id.* § 2001.174(2)(A)-(D), (F). Otherwise, we may affirm the administrative decision if we are satisfied that "substantial evidence" exists to support it. *Id.* § 2001.174(1), (2)(E).

Instances may arise, however, in which the agency's action is supported by substantial evidence, but is nonetheless arbitrary and capricious. *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 454 (Tex. 1984). An agency acts arbitrarily if it makes a decision without regard for the facts, if it relies on fact findings that are not supported by any evidence, or if there does not appear to be a rational connection between the facts and the decision. *See City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 819-20 (Tex. App.—Austin 2011, pet. denied). In other words, we must remand for arbitrariness if we conclude that the agency has not "'genuinely engaged in reasoned decision-making.'" *Id.* (quoting *Starr Cnty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.)).

4

We review the agency's legal conclusions for errors of law and its factual findings for support by substantial evidence. *Heat Energy Advanced Tech., Inc. v. West Dallas Coal. for Envtl. Justice*, 962 S.W.2d 288, 294-95 (Tex. App.—Austin 1998, pet. denied). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988)) (internal quotation marks omitted). We consider the reliable and probative evidence in the record as a whole when testing an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence. *Graff Chevrolet Co. v. Texas Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied); *see* Tex. Gov't Code Ann. § 2001.174(2)(E). We presume that the TCEQ's order is supported by substantial evidence, and the Hutto landowners bear the burden of proving otherwise. *See Charter Med.*, 665 S.W.2d at 453. The burden is a heavy one—even a showing that the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency. *Id.* at 452. Our ultimate concern is the reasonableness of the agency's order, not its correctness. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984).

Whether the agency's order satisfies the substantial-evidence standard is a question of law. *Id.* Thus, the district court's judgment that there was substantial evidence supporting the TCEQ's final order is not entitled to deference on appeal. *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal from the district court's judgment, the focus of the appellate court's review, as in the district court, is on the agency's decision. *See*

5

*Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000); *Tave v. Alanis*, 109 S.W.3d 890, 893 (Tex. App.—Dallas 2003, no pet.).

The Legislature has charged the TCEQ with regulating the management of solid-waste disposal and has given it broad discretion to adopt rules for issuing permits for municipal solid-waste disposal facilities. *See* Tex. Health & Safety Code Ann. §§ 361.002 (establishing purpose of Solid Waste Disposal Act is to safeguard people's health, welfare, and physical property and to protect environment by controlling management of solid waste), .011 (West 2010) (granting powers and duties necessary or convenient to carrying out responsibilities for managing municipal solid waste). When there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, we generally defer to the agency's interpretation unless it is "plainly erroneous or inconsistent with the language of the statute, regulation, or rule." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011). But this deference to the agency's interpretation is not conclusive or unlimited—we defer only to the extent that the agency's interpretation is reasonable. *See id.* We construe administrative rules in the same manner as statutes, using traditional principles of statutory construction. *Id.*

When we construe administrative rules and statutes, our primary objective is to give effect to the intent of the issuing agency and legislature, "which, when possible, we discern from the plain meaning of the words chosen." *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) (addressing statutory construction); *see Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999) (addressing rule construction). We consider statutes and rules as a whole rather than their isolated provisions. *TGS-NOPEC*, 340 S.W.3d at 438-39. We presume that the legislature chooses a statute's language with care, purposefully choosing each word it includes, while purposefully omitting words not chosen. *Id.* The meaning of a statute's language may be informed

6

by factors that include the law's objective. Tex. Gov't Code Ann. § 311.023(1) (West 2005); *see also Shumake*, 199 S.W.3d at 284.

**Landfill permit**

The health and safety code requires a permit issued under the Solid Waste Disposal Act to include "the name and address of each person who owns the land on which the solid waste facility is located and the person who is or will be the *operator or person in charge of the facility*." Tex. Health & Safety Code Ann. § 361.087(1) (West 2010) (emphasis added). The landfill permit issued by the TCEQ identifies the County as the "permittee" (i.e., permit holder), "owner," and "site operator," and it identifies Waste Management as the "operator." In its order granting the permit, the TCEQ found that the County was the "applicant" and concluded that "[t]he Applicant has met the requirements of 30 Tex. Admin. Code § 305.43(b) in that [Waste Management] submitted the Application to the Commission on behalf of Williamson County."

In their first issue, the Hutto landowners challenge the TCEQ's conclusions that: (1) Waste Management is the "operator" of the landfill, and (2) Waste Management properly submitted the application on behalf of the County. In other words, the landowners assert that only the County should appear on the permit because they contend that the County is both the owner and operator of the landfill under health and safety code section 361.087(1). Similarly, they argue that Waste Management should not have applied for the permit on the County's behalf because it is not the "operator" of the landfill as defined in chapter 305 of title 30 of the administrative code. They argue that these errors require us to reverse the order authorizing the County to expand the landfill and remand the case to the TCEQ. The TCEQ and the County respond that the TCEQ's challenged conclusions are reasonable under its interpretation of the relevant statute and rules. We will look first to the plain language of the relevant statute and rules to determine whether they are ambiguous;

7

if they are not, we will apply their words according to their common meaning. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011). To the extent that they are ambiguous, we will defer to the agency's interpretation if it is reasonable unless it is "plainly erroneous or inconsistent with the language of the statute, regulation, or rule." *TGS-NOPEC*, 340 S.W.3d at 438.

### *Proper identification of an "operator" under TCEQ rules*

The TCEQ made findings of fact that the County was the sole applicant for the permit, the owner of the landfill, and the sole permittee under the existing landfill permit. The TCEQ also found that Waste Management operates the landfill under a contract with the County. In its conclusions of law, the TCEQ determined that:

- the provisions of 30 Texas Administrative Code chapter 330 "apply specifically to 'all aspects of municipal solid waste management,' and are based primarily on the stated purpose" of chapter 361 of the health and safety code;

- the County is the "owner" of the landfill as defined in rule 330.2(94) of the administrative code;

- the County is the "site operator" of the landfill under rule 330.2(132);

- Waste Management is the "operator" of the landfill under rule 330.2(91);

- the health and safety code requires a permit issued under section 361.087(1) to include the owner's name and address and "the person who is or will be the 'operator' of the facility as defined in 30 Tex. Admin. Code § 330.2"; and

- the draft permit number MSW-1405B will identify the County as the "owner" and "site operator" and Waste Management as the "operator" of the landfill.

The plain language of chapter 330 of title 30 of the administrative code states exactly what the TCEQ concluded: "The regulations promulgated in this chapter cover all aspects of municipal solid waste management . . . and are based primarily on the stated purpose of Texas Civil Statutes, Health and Safety Code, Chapter 361 . . . ." 30 Tex. Admin. Code § 330.1 (2004) (Tex. Comm'n on Envtl. Quality, Declaration and Intent). The definitions of "owner," "site operator," "operator," and "operate" relied on by the TCEQ in its order are found in chapter 330, which specifically governs "Municipal Solid Waste":

- "owner" is "the person who owns a facility or part of a facility";

- "site operator" is "[t]he holder of, or the applicant for, a permit (or license) for a municipal solid waste site";

- "operator" is "[t]he person(s) responsible for operating the facility or part of a facility"; and

- "operate" means "[t]o conduct, work, run, *manage*, or control."

*Id*. § 330.2(88) ("operate"), (91) ("operator"), (94) ("owner"), (132) ("site operator") (2004) (Tex. Comm'n on Envtl. Quality, Definitions) (emphasis added).

The Hutto landowners argue that the County—not Waste Management—should have been identified as the "operator" on the permit. They acknowledge that Waste Management "provides day-to-day landfill management services under a contract with the County"—i.e., Waste Management *operates* the landfill under the chapter 330 definition. They contend, however, that the TCEQ's incorporation of its chapter 330 definition of "operator" into health and safety code section 361.087(1) incorrectly interprets the statute because it conflicts with the statute's plain language. Specifically, the landowners argue that the term "operator" in section 361.087(1) is unambiguously synonymous with "person in charge of the facility" and that "person in charge" does

9

not mean the entity responsible for day-to-day operation of the facility. Instead, they assert that the term "person in charge," and consequently, the term "operator" mean the entity with *ultimate* responsibility for the facility, which they define as the permit holder, if different from the owner.[3] In essence, the landowners argue that an entity responsible for day-to-day management of operations but who does not own the land or hold the permit is not "in charge" of the facility because it is not ultimately responsible for the landfill's operation. Therefore, under the landowners' interpretation of section 361.087(1), because the County as owner and permit holder has ultimate responsibility for the landfill, it is "the person in charge" and thus the "operator" of the landfill.

We must begin by examining the plain language of the statute to determine whether it is ambiguous because we will only defer to the TCEQ's interpretation of the term "operator" if the statute is ambiguous. *See Texas Citizens*, 336 S.W.3d at 628. The landowners contend that the term "operator" is unambiguously synonymous with "person in charge of the facility," and thus "operator" means the person or entity with ultimate responsibility for the property. First, we do not agree that the terms "operator" and "person in charge of the facility" are unambiguously synonymous. Interpreting the two terms to mean the same thing, as the landowners urge, renders either the term "operator" or the term "person in charge" superfluous, and it is an elementary rule of construction that we give effect to every word of a statute so that no part is rendered superfluous. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003). The Legislature's use of the disjunctive term "or" typically signifies a separation between two distinct ideas. *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 581 (Tex. 2000). While the use of the disjunctive usually

---

[3] Similarly, they argue that the chapter 330 definition of "site operator," (i.e., permit holder) is more consistent with their asserted interpretation of "person in charge of the facility." We address the landowners' contention that "operator or person in charge of the facility" means "permit holder, if different from the owner" when analyzing the statute's ambiguity below.

10

indicates alternatives and requires those alternatives to be treated separately, the word "or" does not automatically create a choice between two mutually exclusive options. *Underwriters at Lloyds of London v. Harris*, 319 S.W.3d 863, 866 (Tex. App.—Eastland 2010, no pet.). Instead, Texas courts consider the use of the word "or" against the backdrop of the entire statute. *Id.* at 866-67. In this statute, as we further explain below, "person in charge of the facility" is a clarifying phrase that explains who should be listed on the permit if there are multiple operators.

Second, we disagree that the term "operator" unambiguously means the permit holder, if the owner is not the permit holder. There is no indication that the legislature intended the term "operator" to be defined in this way. The Solid Waste Disposal Act leaves the term undefined. *See* Tex. Health & Safety Code Ann. § 361.003 (West 2010) (establishing applicable definitions). If the legislature had intended a permit to include "the name and address of each person who owns the land on which the solid waste facility is located and the person who is or will be" *the permit holder, if the owner is not the permit holder*, it would have so stated. *Id.* § 361.087(1); *see also Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981). "[E]very word excluded from a statute must also be presumed to have been excluded for a purpose." *Cameron*, 618 S.W.2d at 540. We will not presume that the legislature intended the term "operator" to mean the permit holder, if the owner is not the permit holder, when there is nothing in the language of the statute to indicate that intent.

Finally, we examine the plain meaning of the term "operator." A dictionary definition of "operator" is "a person that actively operates a business," and "operate" means "to cause to function usu[ally] by direct personal effort." Webster's Third New Int'l Dictionary 1581 (2002). Although this could be read to mean that the "operator" is the entity that physically causes the landfill to function, i.e., Waste Management, when the statute is read as a whole, the use of "operator" as an alternative to the "person in charge" of the facility creates ambiguity. "In charge"

11

means "having the control or custody of something." *Id*. at 377. In this case, for example, Waste Management causes the landfill to function, and it also has immediate control and custody of the landfill. The County, on the other hand, does not physically run the landfill, but it has ultimate control of the property. Thus, the statute is ambiguous because we cannot readily determine based on the plain language "who is or will be the operator or person in charge of the facility." Tex. Health & Safety Code Ann. § 361.087(1).

Having determined that section 361.087(1) is ambiguous, we will consider whether the TCEQ's interpretation is both consistent with the statutory language and reasonable. *See TGS-NOPEC*, 340 S.W.3d at 439. We first consider the Hutto landowners' argument that the TCEQ's interpretation is inconsistent with section 361.087(1) because the statute contemplates a maximum of two persons or entities appearing on the permit, the owner of the land and the "operator or person in charge of the facility," if different from the landowner.[4] *See* Tex. Health & Safety Code Ann. § 361.087(1). The landowners assert that the TCEQ's incorporation of the chapter 330 definition of "operator" into section 361.087(1) contradicts the plain language of the statute because the chapter 330 definition includes partial operators of a facility. *See* 30 Tex. Admin. Code § 330.2(91) (including "person(s) responsible for operating the facility or *part of a facility*" in "operator" definition (emphasis added)). As a result, the landowners contend, multiple operators might be included on the permit, despite the statutory language requiring the inclusion of only "*the person* who is or will be the operator or person in charge of the facility." *See* Tex. Health & Safety Code Ann. § 361.087(1) (emphasis added). In this case, it is undisputed that Waste Management

---

[4] We note that section 361.087(1) requires a permit to include "the name and address of *each person* who owns the land on which the solid waste facility is located and *the person* who is or will be the operator or person in charge of the facility." *Id.* § 361.087(1) (emphasis added). Thus, the plain language of the statute contemplates that there may be multiple landowners listed on a permit, but only one "operator or person in charge of the facility."

12

is the only entity that fits the chapter 330 definition of "operator" of the landfill. We disagree that the TCEQ's interpretation of the statute necessarily would lead to the inclusion of multiple operators on the permit in a case that also involved partial facility operators. We read the term "person in charge of the facility" in section 361.087(1) as clarifying that if there are multiple operators, the permit should list only the entity responsible for overall operations, if the entity responsible for overall operations differs from the owner.[5] Consequently, we conclude that the TCEQ's interpretation is consistent with section 361.087(1)'s language.

We next analyze whether the TCEQ's application of the chapter 330 definition of "operator" to section 361.087(1) is reasonable and thus due deference from us. The TCEQ interprets the term "operator" under section 361.087(1) and chapter 330 to mean the entity responsible for managing day-to-day operations at the landfill. The TCEQ Executive Director's primary witness, Pladej Prompuntagorn, a staff engineer in the Municipal Solid Waste Permits Section, testified that the TCEQ wants to know if there is an operator different from the permit holder so that the

---

[5] In a related argument, the Hutto landowners also contend that the TCEQ should have applied chapter 305's definition of "operator" because they argue it is more consistent with section 361.087(1) of the health and safety code, if we accept their interpretation that "operator" and "[t]he person in charge of the facility" both mean the entity with ultimate responsibility for the landfill. *See* 30 Tex. Admin. Code § 305.2(24) (2004) (Tex. Comm'n on Envtl. Quality, Definitions). Chapter 305 defines "operator" as "[t]he person responsible for the overall operation of a facility." *Id.* Thus, the only difference between the chapter 305 definition and the chapter 330 definition is that the chapter 330 definition of "operator" also includes operators of only part of the facility. *See id.* § 330.2(91) (defining "operator") (2004) (Tex. Comm'n on Envtl. Quality, Definitions). As a result, in this case, the TCEQ's designation of Waste Management as the "operator" satisfies both the chapter 330 definition and the chapter 305 definition because it is undisputed that Waste Management is the only entity that provides "day-to-day landfill management services" at the landfill. We find that the TCEQ correctly based the conclusions of law in its order on the chapter 330 definitions. Chapter 305 of the TCEQ rules covers "Consolidated Permits" and thus has some application to landfill permits, but chapter 330 concerns "Municipal Solid Waste" and thus more specifically applies to the permit at issue here. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901 (Tex. 2000) (noting traditional statutory-construction principle that more specific statute controls over more general statute when provisions are irreconcilable).

agency can contact the entity in charge of day-to-day operations if necessary. Under the TCEQ's interpretation, a permit will include more information about the landfill's operation, rather than less, which promotes accountability and enforcement of the TCEQ's rules concerning landfill operation. *See* Tex. Gov't Code Ann. § 311.023(1). This interpretation is reasonable and does not conflict with the statute's plain language; thus, we defer to it.[6]

### *Proper submission of the application*

The Hutto landowners also challenge the TCEQ's conclusion that Waste Management's submission of the permit application on the County's behalf satisfied the TCEQ's rules. Chapter 305 of title 30 of the administrative code concerns the standards and requirements for "Consolidated Permits." *See* 30 Tex. Admin. Code § 305.1 (2004) (Tex. Comm'n on Envtl. Quality, Scope and Applicability). Rule 305.43(b) provides that "it is the duty of the owner of a facility to submit an application for a permit . . . unless a facility is owned by one person and operated by another, in which case it is the duty of the operator to submit an application for a permit." *Id*. § 305.43(b) (2004) (Tex. Comm'n on Envtl. Quality, Who Applies). Chapter 305 defines "operator" as "[t]he person responsible for the overall operation of a facility" and "owner" as "[t]he person who owns a

---

[6] The Hutto landowners contend that "[t]he TCEQ's erroneous interpretation of the Health & Safety Code has potentially serious ramifications related to ownership and control of a valuable public asset, and for the landfill permitting system." They express concern that if Waste Management is listed on the permit as the "operator," it may argue in the future that it is therefore the "person in charge of the facility" and that it is somehow entitled to an ownership interest in the landfill or the permit. We note that the administrative record shows that the ALJs determined that TJFA (one of the appellants here) is competitive with Waste Management and was designed to intervene in proceedings involving landfills operated by its sister companies' competitors, and thus removing all references to Waste Management from the permit might serve TJFA's competitive interests. We need not reach the Hutto citizens' arguments about hypothetical results of an erroneous interpretation of the code, however, because we conclude that the TCEQ's interpretation is reasonable. *See* Tex. R. App. P. 47.1 (court of appeals must hand down written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of appeal).

facility or part of a facility." *See id.* § 305.2(24) ("operator"), (26) ("owner") (2004) (Tex. Comm'n on Envtl. Quality, Definitions). The Hutto landowners again urge that Waste Management cannot be the "operator" under chapter 305 because the County retains responsibility for the overall operation of the landfill as owner and permit holder.

We apply traditional principles of statutory construction to rules. *See TGS-NOPEC*, 340 S.W.3d at 438. When we construe rules, we ascertain and give effect to the agency's intent as expressed by the rules' language. *Id.* at 439. If a rule uses a term with a particular meaning or assigns a particular meaning to a term, we apply that meaning. *Id.* We typically give undefined terms in a rule their ordinary meaning, but if the term's use in the context of the rule makes a different or more precise definition applicable, we apply that meaning. *Id.* And if a rule is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results. *Id.* We consider rules as a whole rather than considering their provisions in isolation. *Id.*

We will apply these principles to determine whether rule 305.43(b) is ambiguous. The rule establishes that it is the operator's duty to submit the application when the owner does not operate the facility. The definition of "operator" is "[t]he person responsible for the overall operation of a facility," but rule 305.2, which provides the applicable definitions for chapter 305, does not provide a definition of "operation." A dictionary definition of "operation" is "doing or performing esp[ecially] of action," and as noted earlier, "operate" has been defined as "to cause to function usu[ally] by direct personal effort." Webster's Third New Int'l Dictionary 1581 (2002). Thus, the plain meaning of the TCEQ's definition of "operator" is the entity responsible for its personal performance of causing the landfill to function. We find that rule 305.43(b) is unambiguous and

15

that the TCEQ properly concluded that Waste Management's submission of the application on the County's behalf comported with the rule.

To the extent that the original application incorrectly identified both the County and Waste Management as applicants on one page, there is substantial evidence in the record showing that the County properly clarified, through both a written statement and testimony, that the County was the applicant and that the County intended that it be the only holder of the permit, i.e., the "site operator" as defined by rule 330.2(132). *See* 30 Tex. Admin. Code § 330.2(132). We conclude that the TCEQ correctly found that the County was the applicant and determined that the County satisfied the requirements of rule 305.43(b) by having Waste Management submit the application on the County's behalf. We overrule the Hutto landowners' first issue.

**Drainage**

The Hutto landowners' second issue concerns what an applicant must show about the proposed landfill's effect on natural drainage patterns. The landowners assert that the TCEQ's order violated a statutory provision because the TCEQ applied its own rule related to what an application must show about drainage patterns in a manner contrary to its statutory mandate. Alternatively, they contend the order was arbitrary and capricious and not supported by substantial evidence because the TCEQ ignored its own standards when determining that natural drainage patterns would not be significantly altered by the proposed landfill development. The TCEQ and the County respond that the TCEQ's interpretation of its own rules is entitled to deference, the County's application complied with those rules, and the County provided substantial evidence of that compliance.

### The TCEQ's interpretation of rule 330.56(f)(4)(A)(iv)

The TCEQ rules require an application for a permit amendment to include "discussion and analyses to demonstrate that natural drainage patterns will not be significantly altered as a result of the proposed landfill development." *See id*. § 330.56(f)(4)(A)(iv) (2004) (Tex. Comm'n on Envtl. Quality, Attachments to the Site Development Plan). The Hutto landowners contend that the TCEQ's interpretation of this rule conflicts with its statutory mandate to "safeguard the health, welfare, and physical property of the people and to protect the environment." Tex. Health & Safety Code Ann. § 361.002(a). Specifically, the landowners complain that the TCEQ did not consider the impact of increased stormwater runoff on neighboring properties or downstream bodies of water. Instead, the TCEQ analyzed the County's evidence of the runoff volumes and rates at the landfill's boundary. The Hutto landowners argue that downstream effects must be considered when assessing the impact of potential changes to natural drainage patterns. They do not, however, explain exactly where or how the County should have analyzed the downstream effects of potential increased runoff.

The Hutto landowners' arguments ultimately challenge the TCEQ's interpretation of rule 330.56(f)(4)(A)(iv). They concede that "[i]f correctly applied, this TCEQ rule would be consistent with the Legislature's command" to safeguard people's property and the environment.[7] Thus, the issue we must resolve is whether the TCEQ has correctly interpreted and applied its rule in this case.

---

[7] The Hutto landowners also contend that the TCEQ's policy is not "'in harmony' with the general objectives of the legislation involved" and thus is improper as a matter of law, citing *Gulf Coast Coalition of Cities v. Public Utilities Commission*, 161 S.W.3d 706, 711-12 (Tex. App.—Austin 2005, no pet.). *Gulf Coast*, however, involved a validity challenge to an agency rule, not a challenge to the agency's interpretation of its rule. *Id.* As we explained in *Gulf Coast*, whether the rules are "in harmony" with the general objectives of the legislation involved is the determining factor in whether the agency has exceeded its rulemaking authority. *Id.* at 711.

The TCEQ interprets rule 330.56(f)(4)(A)(iv) as requiring an analysis of stormwater discharge impact only at the permit boundary "to demonstrate that natural drainage patterns will not be significantly altered as a result of the proposed landfill development." As we previously mentioned, when there is vagueness, ambiguity, or room for policy determinations in a regulation, we will defer to the agency's interpretation unless it is "plainly erroneous or inconsistent with the language of the statute, regulation, or rule." *TGS-NOPEC*, 340 S.W.3d at 438. Because the language of the rule requires discussion and analysis sufficient to demonstrate no significant effect on natural drainage patterns, but provides no further direction about what must be shown or where, the rule is ambiguous and leaves room for policy determinations by the TCEQ. *See id.* Thus, we must consider whether the TCEQ's interpretation is inconsistent with the rule's language or otherwise plainly erroneous. *See id.* If the TCEQ's interpretation is reasonable and in accord with the plain language of the rule, we will uphold it.[8] *See Texas Citizens*, 336 S.W.3d at 628 (noting that agency's interpretation need not be best or only interpretation to warrant court's deference).

The TCEQ asserts that nothing in its rules requires stormwater-discharge analysis downstream from a facility's permit boundaries, and the Hutto landowners do not point out any other rules that require a downstream analysis. The TCEQ explains that it does not require downstream

---

[8] The TCEQ points us to two prior contested-case hearings in which it established this interpretation. *See* Tex. Comm'n on Envtl. Quality, *An Order approving the Application of North Texas Municipal Water District for Municipal Solid Waster Permit No. MSW-2294*, TCEQ Docket No. 2002-0745-MSW, SOAH Docket No. 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, at 18 (Oct. 20, 2003); Tex. Natural Res. Conserv. Comm'n, *An Order denying the application by Blue Flats Disposal, L.L.C., for Permit No. MSW-2262*, TNRCC Docket No. 98-0415-MSW, SOAH Docket No. 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, at 8 (Jan. 2, 2001). We give some deference to an agency's reasonable interpretation of its own ambiguous rule when that interpretation has been adopted in a formal opinion after formal proceedings. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011). The TCEQ formally adopted the interpretation requiring downstream-impact analysis only at the permit boundary in this case, as well as in *Blue Flats* and *North Texas Municipal Water District*. Consequently, we will review its interpretation and uphold it if it is reasonable and consistent with the statute's plain language. *Id.*

18

analysis, in part because of the site-specific nature of landfill design, which precludes the agency from prescribing criteria for determining where and how far downstream a discharge-impact analysis beyond the permit boundaries would need to go. The TCEQ further explains that it does not require analysis of downstream areas beyond the permit boundaries because those areas will be influenced by variables, including water from other sources, that are unrelated to the landfill discharge. And as the County points out, the permit boundary is the point at which the discharges will be at their peak rate and maximum velocity. Although the Hutto landowners contend that the TCEQ's approach ignores the appropriate role of engineering judgment because engineers are capable of analyzing runoff conditions in the landfill's vicinity, this argument does not refute the TCEQ's explanation that drainage patterns in neighboring areas will be influenced by variables beyond its control and unrelated to the landfill or that the permit boundary is the point of any discharge's peak rate and maximum velocity. The TCEQ's interpretation of its rule as requiring consideration of discharge impact only at the permit boundary is reasonable, not in conflict with the rule's plain language, and concerns a matter within the TCEQ's administrative expertise. *See id.* at 630 (holding that agency may appropriately decline to consider matters beyond its administrative expertise, including potentially limitless number of factors related to "public interest" unrelated to agency's express legislative directive). Moreover, we conclude that this reasonable policy determination does not conflict with the TCEQ's statutory mandate to "safeguard the health, welfare, and physical property of the people and to protect the environment." Tex. Health & Safety Code Ann. § 361.002(a).

### *Substantial evidence supporting no significant alteration of natural drainage patterns*

The Hutto landowners also contend that even if the TCEQ's interpretation of the rule is reasonable, its findings about two discharge points were not supported by substantial evidence and

19

were arbitrary and capricious because the TCEQ ignored its own standards. The TCEQ found that the increased runoff volume at two discharge points, Discharge Point A and Discharge Point B, would be mitigated by controlling the *rate* of discharge and that the proposed landfill expansion would not increase peak flow rates significantly at any discharge point. The TCEQ also found that the proposed landfill expansion would not significantly alter natural drainage patterns. The Hutto landowners argue that the TCEQ's findings are inconsistent with its own guidance document, *Guidelines for Preparing a Surface Water Drainage Plan for a Municipal Solid Waste Facility* ("*Guidelines*").[9] The landowners also argue that the TCEQ erroneously champions a per se rule that a reduction in peak flow rates means there can be no significant alteration of drainage patterns, no matter the amount of increased volume of runoff.

Both the TCEQ's position that increased volume may be mitigated by a reduction in peak flow rates and its findings about Discharge Points A and B are consistent with the *Guidelines*.[10] In the *Guidelines*, the TCEQ explains that the significant-alteration issue "is best determined on a case-by-case basis and is one of professional judgment." The *Guidelines* also state that the TCEQ cannot set a clear-cut number or percentage of change that will indicate a significant change, but an applicant should demonstrate that the landfill expansion's effect on peak flows, volumes, and

---

[9] The parties agree that the June 2004 version of *Guidelines for Preparing a Surface Water Drainage Plan for a Municipal Solid Waste Facility* ("*Guidelines*") applies to the permit application. The guidelines have been revised; the version of the *Guidelines* that the parties agree applies is available at http://www.tceq.state.tx.us/assets/public/comm_exec/pubs/archive/rg417.pdf. We take judicial notice of the June 2004 version of the *Guidelines*. *See* Tex. R. Evid. 201(b)(2), 204.

[10] The *Guidelines* state that the document is not intended by the TCEQ to be used as rules or policy and that it does not include all acceptable practices. It provides suggestions for preparing an adequate surface-water drainage plan and focuses on issues that can be used to demonstrate that there is no alteration in the drainage pattern at a landfill. While not rising to the level of rules or policy, the document is indicative of at least some practices that the TCEQ finds to be acceptable methods for controlling surface-water drainage.

velocities from each permit boundary discharge point will not significantly alter drainage patterns. These three factors are not completely independent of each other, however. For example, the *Guidelines* explain that typical methods for demonstrating that any volume increase is not significant include, among others, using stormwater retention ponds to control peak flow and demonstrating that the additional volume will be released at a rate that will not significantly adversely affect the downstream receiving water body. Similarly, velocity is a function of the flow rate, among other factors. The *Guidelines* explain that the goal of the landfill's stormwater management system should be to return the stormwater flow to its predevelopment condition before it leaves the permit boundary, which is consistent with maintaining natural drainage patterns. The *Guidelines* suggest achieving this goal by locating detention-pond outlet structures and other velocity-dissipation devices upstream from the stormwater discharge point to allow flow to return to the predevelopment condition at the permit boundary.

The County's application and the testimony from its lead engineer for the application, James Murray (who also served as the County's general expert in landfill permitting, design, construction, and operation), established that the County's design for the landfill expansion, which included three detention ponds to control the rate of stormwater discharge, adequately addressed the issue of increased stormwater volume. Murray explained that the County designed a drainage system for the entire landfill that included "designing terraces and drainage structures and rundown channels on the landfill itself, a landfill perimeter system, landfill detention ponds, modeling all this and discharging the stormwater at the same locations that the natural condition discharges stormwater." He testified that the drainage design was based on estimated stormwater-runoff peak flow rates, volumes, and maximum velocities for a 24-hour, 25-year storm event, as required by the TCEQ's rules. The County compared predevelopment (before any landfill) conditions to post-

21

development conditions (i.e., proposed post-closure conditions) when determining whether the expansion design satisfied rule 330.56(f)(4)(A)(iv).

As Murray explained, any development of land will generally cause an increase in runoff volume because there is more impermeable cover over the land. The drainage terraces, perimeter channels, and detention paths incorporated into the County's landfill expansion design generally create a longer, more complicated flow path for stormwater. In this way, the design minimizes the effect of any increased volume of water by lessening the velocity at which it is discharged. Murray testified that the primary factors in evaluating natural drainage patterns and the effect of development upon those patterns are peak flow rate, location of the discharge points, and the flooding conditions at those discharge points, which include the velocity of the water and the width and depth of the flow in the receiving channels at or upstream from the permit boundaries. He explained that volume is part of the calculation of peak flow rate. In particular, Murray testified that although the runoff volume for a 24-hour, 25-year storm event at Discharge Point A would increase from 62 acre-feet under natural conditions to 90 acre-feet under the proposed conditions, the peak discharge rate would decrease from 195 cubic feet per second to 178 cubic feet per second. Similarly, for Discharge Point B, although the runoff volume for a 24-hour, 25-year storm event would increase from 29 acre-feet under natural conditions to 81 acre-feet under proposed conditions, the peak discharge rate would decrease from 114 cubic feet per second to 106 cubic feet per second.

The Hutto landowners assert that the TCEQ departed from its own *Guidelines* by considering peak flow rate to be the controlling factor when determining that the increased volume at Drainage Points A and B would not significantly alter natural drainage patterns. Although the landowners correctly point out that the *Guidelines* explain that an applicant must demonstrate that flow rate, velocity, and volume should not change significantly when compared to predevelopment

22

conditions, the *Guidelines* also explain that methods for demonstrating that any volume increase is not significant include using stormwater detention ponds and showing that any volume increase will be released at a rate that will not significantly affect the downstream receiving water body. There is substantial evidence in the record showing that the County used these methods to show no significant alteration on natural drainage patterns from the increased volume at Discharge Points A and B. The TCEQ did not act in an arbitrary and capricious manner in reaching this conclusion. We overrule the Hutto landowners' second issue.

**Soil hydrology and hydrogeology**

In their third issue, the Hutto landowners mount a similar challenge to the TCEQ's interpretation of its rules about soil testing and groundwater monitoring. Specifically, they argue that the TCEQ failed to require the County to comply with its rules about horizontal permeability testing of soil layers along the side of proposed excavations and the installation of a groundwater monitoring system. Because the landowners' arguments on this issue implicate the specifics of the evidence submitted by the County about its soil testing and its proposed groundwater-monitoring system, we will consider whether the TCEQ's interpretation of its rules was reasonable and consistent with the rules' language in conjunction with our analysis of whether the record contains substantial evidence to support the TCEQ's findings and conclusions that the County's application complied with its rules on these issues.

*Soil-sample testing*

The TCEQ's rules require an applicant to establish a groundwater-monitoring system that will yield representative groundwater samples from the uppermost aquifer, and the system's design must be based upon site-specific technical information that includes a thorough

23

characterization of the geology and hydrogeology beneath the landfill. 30 Tex. Admin. Code § 330.231(a), (e)(1) (2004) (Tex. Comm'n on Envtl. Quality, Groundwater Monitoring Systems). This thorough characterization must include, among other things, the hydraulic characteristics of the soil layers overlying the uppermost aquifer. *Id.* § 330.231(e)(1). The TCEQ's rules also require an application to include a report that describes the geotechnical properties of the subsurface soil materials and includes conclusions about the suitability of the soils and strata for the uses for which they are intended. *Id*. § 330.56(d)(5)(B) (2004) (Tex. Comm'n on Envtl. Quality, Attachments to the Site Development Plan). The report must include a laboratory report of soil characteristics determined "from at least one sample from each soil layer or stratum that will form the bottom and side of the proposed excavation and from those that are less than 30 feet below the lowest elevation of the proposed excavation." *Id.* § 330.56(d)(5)(B)(i). The applicant must perform permeability tests on "undisturbed samples that represent the sidewall of any proposed trench, pit, or excavation" on the sample's in-situ horizontal axis, and all other samples must be tested on the in-situ vertical axis. *Id.* § 330.56(d)(5)(B)(ii).

The permit application shows that there are three soil layers at issue: surficial clay, claystone, and limestone. The County proposes excavating and disposing waste in the top two layers, the surficial clay and claystone. Dr. Paul Cravens, the County's geotechnical engineering expert who reviewed the geotechnical report submitted with the County's permit application, said in his prefiled testimony that the County had tested at least one sample from each soil layer or stratum that will form the bottom and side of the proposed excavation and also tested one sample from the geologic units that are less than 30 feet below the lowest elevation of the proposed excavation. In addition, he testified that:

24

[s]amples of the most representative surficial sidewall soils were subjected to permeability tests along their horizontal axes. Samples of the isolated discontinuous coarse-grained deposits encountered along the eastern portion of the expansion area were not suitable for laboratory testing for permeability. In lieu of this, field hydraulic conductivity tests ('slug tests') were conducted.

He added that all other samples were tested for the coefficient of permeability on the sample's in-situ vertical axis.

The Hutto landowners rely on the testimony from the TCEQ's staff geologist witness, Wesley McCoy, that the County did permeability tests only on samples of unfractured claystone from the proposed excavation site and not on any samples of fractured claystone to support their argument that the County's testing did not comply with the TCEQ's rules. They contend that by not testing fractured claystone, which has cracks that might transmit pollutants to surrounding groundwater, the County did not test representative samples of the soil. They base this contention on the rules' language requiring testing of layers that "will form" the bottom and side of the proposed excavation and of undisturbed samples that "represent the sidewall" of the proposed excavation. McCoy's testimony, however, does not contradict Dr. Cravens's testimony, which indicates that the County took samples from the places required under the rules and subjected those samples not suitable for laboratory testing for permeability to a different type of test.[11] Dr. Cravens pointed out

_____

[11] Even if we determined that there was a conflict between Dr. Cravens's and McCoy's testimony, the ALJs and the TCEQ, acting as the factfinders, determine the credibility of witnesses and the weight of their testimony. *See Citizens Against Landfill Location v. Texas Comm'n on Envtl. Quality*, 169 S.W.3d 258, 266-67 (Tex. App.—Austin 2005, pet. denied). We may not substitute our judgment for that of the agency on the weight of the evidence on questions committed to agency discretion. *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984); *see also* Tex. Gov't Code Ann. § 2001.174 (West 2008). We may not set aside an agency decision merely because testimony was conflicting or disputed or because it did not compel the agency's decision. *See Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984). Consequently, if the evidence would support either affirmative or negative findings on a specific matter, we uphold the agency's decision. *Charter Med.*, 665 S.W.2d at 453.

during his live testimony that core samples containing significant fractures cannot be taken because they would not be in one piece.

In addition, the County emphasizes that laboratory permeability testing is only one of multiple methods that may be used under the TCEQ's rules to estimate the rate of groundwater flow beneath the landfill, and that it conducted other permissible tests, including in-situ hydraulic conductivity tests ("slug tests") and testing groundwater in piezometers. The County's geologist, Karen Gallup, and Dr. Cravens both testified about the results of these tests. Dr. Cravens explained the importance of looking at all samples and tests to determine permeability, not just one discrete sample in one layer. The County's application contained the ranges of permeabilities for each of the three soil layers. It also described the ranges of permeabilities for the interfaces between those layers and the coarse-grained material in the surficial clay, which were the areas under the landfill that Gallup identified as having the preferential pathways for groundwater flow because they had the greatest density of fractures or the greatest porosity.

We find that the TCEQ's interpretation of its rules that soil-sample testing must be conducted on samples that "will form the bottom and side of the proposed excavation" and on "undisturbed samples that represent the sidewall" of any proposed excavation is reasonable and not inconsistent with the plain language of the rule. Furthermore, there is substantial evidence in the record that supports the TCEQ's findings that the County had adequately characterized the geology and hydrogeology of the proposed expansion site.

### Groundwater-monitoring system

The Hutto landowners also contend that the TCEQ should have required the County to install a groundwater-monitoring system that included placing monitoring wells in the claystone layer, which is the middle layer between the surficial clay and limestone layers, rather than only

26

at the contact zones between the three layers. This contention is based on their assertion that the County failed to establish the horizontal permeability of the fractured portions of the claystone because it did not test what they consider to be "representative" soil samples. The County placed 35 piezometers within the layers of surficial clay and lower claystone-upper limestone. Gallup testified that the County identified the claystone-limestone interface as more permeable than the claystone alone.[12] In addition, the soil samples showed a prevalence of vertical and subvertical fractures in the claystone. Gallup testified that any water in the claystone will move from less permeable paths to more permeable paths and will also be affected by gravity and begin moving downward, even if it begins by trickling horizontally. As it reaches its preferential flow path, that water will be directed toward the piezometer nearest it in the claystone-limestone interface. Thus, there is no need to install piezometers solely within the claystone stratum. The proposed groundwater-monitoring network of wells was designed to monitor groundwater flow in the preferential pathways. The TCEQ's rules require the groundwater-monitoring system to have a "sufficient number of monitoring wells, installed at appropriate locations and depths." *Id.* § 330.231(a). The substantial evidence in the record supports the TCEQ's findings that the "proposed groundwater monitoring wells will be placed at appropriate depths at the base of the uppermost aquifer," and "[i]t is not necessary to monitor the claystone stratum itself other than at the levels anticipated in Williamson County's proposed groundwater monitoring system" and other findings related to the groundwater-monitoring system's compliance with the TCEQ's rules. We overrule the Hutto landowners' third issue.

---

[12] The TCEQ found that the claystone-limestone unit forms the lower boundary of the uppermost aquifer and is the only strata available to monitor subsurface water for the entire site.

**Land use**

The TCEQ concluded that the proposed landfill expansion "is compatible with surrounding land uses," as required by section 361.069 of the health and safety code. Tex. Health & Safety Code Ann. § 361.069 (West 2010). It made ten findings of fact in support of that conclusion. The Hutto landowners assert in their fourth issue that the TCEQ erred by concluding that the County demonstrated the compatibility of the proposed landfill expansion with surrounding land uses. The landowners argue that the County did not carry its burden to prove land-use compatibility because it only provided basic information about land use in its case-in-chief and waited until its rebuttal to provide an expert witness to address land use. They complain about both the TCEQ's interpretation of its rule and the sufficiency of the information supplied by the County.

### *The TCEQ's interpretation of 30 Tex. Admin. Code § 330.53(b)(8)*

The TCEQ's rules require a permit-amendment applicant to provide a land-use map (with detailed requirements) and information about (1) zoning at the site and in the vicinity, (2) character of surrounding land uses within one mile of the proposed facility, (3) growth trends of the nearest community with directions of major development, (4) proximity to residences and other uses (e.g., schools, churches, cemeteries, historic structures and sites, archaeologically significant sites, sites having exceptional aesthetic quality, etc.), including the approximate number of residences and businesses within one mile of the proposed facility and their distances and directions, and (5) description and discussion of all known wells within 500 feet of the proposed site. 30 Tex. Admin. Code § 330.53(b)(7), (8) (2004) (Tex. Comm'n on Envtl. Quality, Technical Requirements of Part II of the Application). The Hutto landowners do not dispute that the County provided this information with its application. Instead, they contend that "the County was required to present some evidence that the information was analyzed by a qualified person, and that this person found

28

land use compatibility" because the rules require "the *applicant* to 'consider' land use compatibility through actual analysis, rather than simply presenting a list of information." (Emphasis added.)

The plain language of the rule does not support the Hutto landowners' argument. The rule states the following:

> Land use. A primary concern is that the use of any land for [a municipal solid waste] site not adversely impact human health or the environment. The impact of the site upon a city, community, group of property owners, or individuals must be considered in terms of compatibility of land use, zoning in the vicinity, community growth patterns, and other factors associated with the public interest. To assist the *executive director* in evaluating the impact of the site on the surrounding area, the applicant shall provide the following [information listed above].

*Id*. § 330.53(8) (emphasis added). It is clear from the context of the paragraph that the executive director must consider and evaluate the site's impact and the applicant assists the executive director in that endeavor by providing the requested information. But even if the paragraph were ambiguous, we would defer to the TCEQ's reasonable interpretation of the rule as only requiring the requested information from the applicant, not any kind of additional land-use analysis by the applicant. *See Texas Citizens*, 336 S.W.3d at 628.

### *Substantial evidence of land-use compatibility*

The Hutto landowners also challenge whether the information submitted by the County sufficed to carry its burden of proof of land-use compatibility, especially concerning the growth trends of Hutto, primarily based on the County's failure to produce an expert witness until its rebuttal. The County introduced rebuttal testimony and a report from John Worrall, a land-use expert, to rebut testimony from the Hutto landowners' land-use compatibility witness, Dr. David Borrer, superintendent of Hutto Independent School District ("Hutto ISD"). Dr. Borrer testified about the

29

relationship of the landfill expansion to land that Hutto ISD had recently purchased near the existing landfill and the growth of Hutto generally.

Worrall included information in his report that supplemented the information supplied by the County in its application. He discussed existing conditions around the current landfill, which has been in operation since 1983 and has an anticipated life of between 25 and 50 years without the expansion. The evidence showed that approximately 92% of the land within one mile of the landfill is either agricultural or commercial and industrial. There are no zoning restrictions because the land is outside Hutto's municipal limits and its extraterritorial jurisdiction. At the time of the application, there were no schools within one mile of the landfill (Hutto ISD did not purchase land near the landfill until August 2007). There were also no day-care centers, churches, archaeologically significant sites, or sites of exceptional aesthetic value.

Worrall also discussed Hutto's status as the fastest growing community in Texas and various estimates of its population. He testified about the likely direction of Hutto's growth and the various types of expected growth, i.e., institutional, residential, and commercial. The City of Hutto's 2006 Growth Guidance Plan characterized future development of the area around the current landfill as "institutional," which Worrall testified is a designation compatible with both a landfill and a school. In short, there is substantial evidence in the record supporting the TCEQ's findings of fact about land-use compatibility, which support its conclusions that the application contains the technical information required under rule 330.53(b) and that the landfill expansion is compatible with surrounding land uses. We overrule the Hutto landowners' fourth issue.

**Revised operating hours**

In their fifth issue, the Hutto landowners challenge the TCEQ's revision of the operating hours proposed by the ALJs. Although the application had proposed that the landfill

30

operate 24 hours a day, seven days a week, the ALJs recommended authorizing the County to operate the landfill from 5:00 a.m. until 8:00 p.m. Monday through Friday and from 6:00 a.m. until 4:00 p.m. on Saturday. The ALJs also proposed that the County be allowed to operate the landfill 24 hours a day, seven days a week in an emergency situation for the emergency's duration and left it to the discretion of the executive director of the TCEQ to determine what conditions would constitute an emergency. The ALJs found that operating the landfill 24 hours a day, seven days a week in non-emergency conditions "may be incompatible with surrounding land uses."

The TCEQ revised the landfill's operating hours in its final order and distinguished between hours that the County is authorized to accept waste at the landfill and hours that it is authorized to operate heavy equipment and transport materials to and from the landfill. While the waste-acceptance hours remained the same as those recommended by the ALJs, the TCEQ expanded the hours during which the County may operate heavy equipment and transport materials to and from the landfill to 3:00 a.m. until 10:00 p.m. Monday through Saturday, an addition of 29 operating hours per week. In the order's explanation of changes, the TCEQ said that it modified the hours "to clarify the different types of operating hours" at the landfill and that it determined these to be "appropriate facility operating hours." *See* 30 Tex. Admin. Code § 330.118 (2004) (Tex. Comm'n on Envtl. Quality, Facility Operating Hours). The TCEQ did not, however, provide any explanation or support for the expansion of hours for the operation of heavy equipment and transportation of materials to and from the landfill. *See* Tex. Health & Safety Code Ann. § 361.0832(f) (West 2010) (requiring TCEQ to "fully explain" in its order "the reasoning and grounds for overturning each finding of fact

31

or conclusion of law or for rejecting any proposal for decision on an ultimate finding"); *accord* Tex. Gov't Code Ann. § 2001.058(e) (West 2008).[13]

The Hutto landowners assert that the TCEQ erroneously overturned the ALJs' findings and conclusions on operating hours because the Commission failed to address whether extending the landfill's hours for operation of heavy equipment and transportation of materials was compatible with surrounding land uses. *See* Tex. Health & Safety Code Ann. § 361.0832(c)-(d) (allowing TCEQ to overturn underlying finding of fact only if not supported by great weight of evidence and to overturn conclusion of law only if clearly erroneous under precedent and applicable rules). The TCEQ acknowledges that the ALJs intended for all the landfill's operations to be conducted during the recommended operating hours because they did not distinguish among the different types of hours that the agency's rule established. *See* 30 Tex. Admin. Code § 330.118 (providing default waste-acceptance hours of 7:00 a.m. until 7:00 p.m., Monday through Friday, and default prohibition of heavy-equipment operation and materials transportation between 9:00 p.m. and 5:00 a.m., unless otherwise approved). As a result, the TCEQ should have explained in its order why it rejected the ALJs' findings. Tex. Health & Safety Code Ann. § 361.0832(f); Tex. Gov't Code Ann. § 2001.058(e). By failing to do so, it has violated section 361.0832(f) and exceeded its statutory authority by overturning the ALJs' findings with no explanation of its reasoning and

_____

[13] Similarly to section 361.0832(f) of the health and safety code, section 2001.058(e) of the government code provides that a state agency must state in writing the specific reason and legal basis for a change made to a finding of fact, conclusion of law, or order issued by an ALJ. Tex. Gov't Code Ann. § 2001.058(e) (West 2008). Although section 361.0832(c)-(e) provides a different standard under which the TCEQ's grounds for a change are reviewed than that provided in section 2001.058(e)(1)-(3), the provisions in both statutes requiring a written explanation of the reasoning and grounds for a change are similar enough to permit us to consider cases applying this portion of section 2001.058(e) when analyzing whether the TCEQ adequately stated its reasoning and grounds for revising the landfill's hours of operation. *See* Tex. Health & Safety Code Ann. § 361.0832(g) (West 2010) (establishing that this section controls if conflict arises between it and section 2001.058(e) of government code).

grounds for so deciding. *See* Tex. Gov't Code Ann. § 2001.174; *see also State v. Mid-South Pavers, Inc.*, 246 S.W.3d 711, 722-23, 728 (Tex. App.—Austin 2007, pet. denied) (explaining that neutral factfinder in contested cases and limitation on agency's discretion to make changes to ALJ's proposed decision play important roles in protecting due process).

We note that in response to the landowners' argument, the TCEQ and the County contend that the hours the TCEQ authorized are compatible with surrounding land uses and were supported by ample evidence. But the issue here is whether the TCEQ adequately explained the reasoning and grounds for its change to the hours. *See Levy v. Texas State Bd. of Med. Exam'rs*, 996 S.W.2d 813, 816 (Tex. App.—Austin 1998, no pet.) (holding that agency is required to articulate its specific reason for each individual change made to ALJ's proposal for decision and refusing to consider whether substantial evidence supported agency's order that provided insufficient explanation for changes). The TCEQ rejected the hours of operation that the ALJs determined to be appropriate and expanded those hours, but in its written explanation stated only that it modified the applicable finding of fact and ordering provision to clarify different types of hours. This explanation does not satisfy the statutory standard. The code requires the TCEQ to "fully explain" why the ALJs' findings establishing the landfill's operating hours were not supported by the great weight of evidence when overturning those findings. *See* Tex. Health & Safety Code Ann. § 361.0832(c), (f). The TCEQ failed to provide its reasoning and grounds for expanding the hours for heavy-equipment operation and materials transport by 29 hours a week. *See id.* § 361.0832(f); Tex. Gov't Code Ann. § 2001.058(e); *see also Levy*, 996 S.W.2d at 815-16 (holding that agency failed to articulate rational connection between statutorily allowed ground for change and change ordered by agency to ALJ's findings of fact and conclusions of law).

33

We therefore hold the order insufficient under health and safety code section 361.0832 and sustain the Hutto landowners' fifth issue.[14] We will remand the case to the TCEQ for further proceedings consistent with this opinion. *See Freightliner Corp. v. Motor Vehicle Bd. of Tex. Dep't of Transp.*, 255 S.W.3d 356, 365-66 (Tex. App.—Austin 2008, pet. denied) ("Courts are legislatively empowered to limit the scope of a remand to the part of an order that contains error."); *see also* Tex. Gov't Code Ann. § 2001.174 (allowing courts to affirm agency decision in whole or in part and remand case for further proceedings if appellant's substantial rights have been prejudiced because decision violates statutory provision or exceeds agency's statutory authority). On remand, the TCEQ may resume exercising its discretion from the point at which it exceeded its authority, i.e., when it issued the order that failed to explain its reasoning and grounds for changing the operating hours. *See Freightliner*, 255 S.W.3d at 366 (holding that appellate court's remand to agency that was limited in scope allowed agency to resume exercising discretion from point at which it exceeded its authority and did not allow agency to reconsider determination on another issue that appellate court held was supported by substantial evidence); *see also Texas Health Facilities Comm'n v. Nueces Cnty. Hosp. Dist.*, 581 S.W.2d 768, 770 (Tex. Civ. App.—Austin 1979, no writ) (approving district court's remand of case to agency that limited remand to record previously made before agency).

---

[14] The Hutto landowners seek to restrict the landfill's hours of operation to those recommended by the ALJs. We note, however, that we may not substitute our judgment for the TCEQ's judgment by affirming the ALJs' decision. *See* Tex. Gov't Code Ann. § 2001.174. When we find that an appellant's substantial rights have been prejudiced because the agency's decision violated a statutory provision or exceeded its statutory authority, our options are to reverse or to remand the case to the agency for further proceedings. *Id.* § 2001.174(2).

**Reallocation of costs**

In their sixth issue, the Hutto landowners complain of the TCEQ's decision to change the ALJs' finding that the County should pay the reporting and transcription costs by reallocating the costs among the County and the landowners. At oral argument and in its brief, the County stated that "it has not recovered, and does not intend to pursue recovery of, costs from" the landowners. We conclude that the County's decision to bear the reporting and transcription costs, as the ALJs recommended, renders this issue moot. Consequently, we need not address this issue. *See* Tex. R. App. P. 47.1 (court of appeals must hand down written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of appeal).

## CONCLUSION

Having overruled four of the Hutto landowners' six issues on appeal, found one to be moot, and sustained its remaining issue, we affirm the trial court's judgment in part and reverse in part. We remand the cause to the TCEQ for further proceedings consistent with this opinion.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed in part; Reversed and Remanded in part on Motion for Rehearing

Filed: December 28, 2012

35