TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

 NO. 03-17-00785-CV

 Appellants, Texas Commission on Environmental Quality and Dos Repúblicas Coal
 Partnership// Cross-Appellants, Maverick County; City of Eagle Pass; Environmental
 Defense Fund; Walter Herring; Ernesto Ibarra; Gabriel De La Cerda; Mike Hernandez;
Boulware and Anson Family, Ltd; and Maverick County Environmental and Public Health
 Association

 v.

 Appellees, Maverick County; City of Eagle Pass; Environmental Defense Fund;
 Walter Herring; Ernesto Ibarra; Gabriel De La Cerda; Mike Hernandez; Boulware and
Anson Family, Ltd; and Maverick County Environmental and Public Health Association//
Cross-Appellees, Texas Commission on Environmental Quality and Dos Repúblicas Coal
 Partnership

 FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
 NO. D-1-GN-16-005038, HONORABLE TIM SULAK, JUDGE PRESIDING

 MEMORANDUM OPINION

 This administrative appeal concerns a Texas Pollutant Discharge Elimination System

(TPDES) permit application for industrial wastewater discharges from the Eagle Pass Mine (the

Mine) that was submitted by Dos Repúblicas Coal Partnership (DRCP) to the Texas Commission

on Environmental Quality (TCEQ). The City of Eagle Pass, Environmental Defense Fund, Walter

Herring, Ernesto Ibarra, Gabriel De La Cerda, Mike Hernandez, Boulware and Anson Family, Ltd,

and Maverick County Environmental and Public Health Association (collectively, the Downstream
Landowners) and Maverick County (the County) (collectively, with the Downstream Landowners,

the Permit Contestants) challenged the TPDES permit in a contested case hearing.

 In a final order, TCEQ granted the TPDES permit over the Permit Contestants’

challenges. The Travis County district court reversed and remanded on one issue—whether DRCP,

the undisputed owner, was also properly considered the operator for purposes of submitting the

application—but affirmed TCEQ’s order in all other respects. DRCP and TCEQ now appeal the

district court’s judgment reversing and remanding the operator issue. On cross appeal, the Permit

Contestants challenge the district court’s judgment affirming TCEQ’s order as to all other issues

raised. For the reasons described below, we agree with the district court’s judgment reversing

TCEQ’s order as to the operator issue and remanding for further proceedings, but we vacate in part

the judgment affirming TCEQ’s order as to all other issues raised.

 I. FACTUAL AND PROCEDURAL BACKGROUND1

 DRCP owns the subbituminous coal Mine located in Maverick County, Texas.

DRCP’s predecessor in interest acquired a surface coal mining permit for the Mine in 2000, which

was transferred to DRCP in 2009.2 See Tex. Nat. Res. Code § 134.051 (requiring permit before

conducting surface coal mining operations). In 2009, DRCP entered into a Contract Mining

Agreement with Camino Real Fuels, LLC (CRF) for CRF to “develop, construct, operate and

 1
 The recited facts in this section are taken from TCEQ’s unchallenged findings of fact and
the undisputed facts in the administrative record.
 2
 The surface coal mining permit for the Mine has been the subject of previous appeals
before this Court. See Maverick County v. Railroad Comm’n, No. 03-14-00257-CV,
2015 WL 9583873 (Tex. App.—Austin Dec. 29, 2015, pet. denied) (mem. op.); Railroad Comm’n
v. Coppock, 215 S.W.3d 559 (Tex. App.—Austin 2007, pet. denied).

 2
perform on-going reclamation at the Mine and to remove and deliver coal from the Mine” to DRCP.

In 2013, the Railroad Commission renewed and issued to DRCP the surface coal mining permit and

approved CRF as the operator of the Mine. See id. § 134.004(10) (defining “operator” for purposes

of Texas Surface Coal Mining and Reclamation Act as “person engaged in coal mining who removes

or intends to remove more than 250 tons of coal from the earth by coal mining within 12 consecutive

months in one location”). Removal of coal began in 2015. However, without a TPDES permit,

DRCP would not be able to operate the Mine as it is currently designed. See Tex. Water Code

§ 26.121 (prohibiting unauthorized discharge of industrial wastewater into or adjacent to water in

the state); 30 Tex. Admin. Code § 305.1(b) (Tex. Comm’n of Envtl. Quality, Scope and

Applicability) (describing TPDES permit program).3

 DRCP’s predecessor in interest acquired a wastewater discharge permit for the Mine

in 1994, which was renewed in 2001, 2006, and most recently on November 7, 2011 (the Current

TPDES Permit),which was set to expire on September 1, 2015. See Tex. Water Code § 26.027(a)

(authorizing TCEQ to issue permits “for the discharge of waste or pollutants into or adjacent to water

in the state”). On September 5, 2013, DRCP applied to TCEQ to amend and renew the Current

TPDES Permit. Although DRCP had held a TPDES permit for many years, it had not discharged

prior to submitting its September 2013 application. The Current TPDES Permit authorized

discharges of stormwater and mine seepage water from active mining areas through certain outfalls,4

 3
 Rule citations are to those in effect in 2013, when DRCP filed its application. All citations
to title 30 of the Texas Administrative Code are to rules promulgated by TCEQ.
 4
 An outfall is “[t]he point or location where waterborne waste is discharged from a sewer
system, treatment facility, or disposal system into or adjacent to water in this sate.” 30 Tex. Admin.
Code § 305.2(25) (Definitions).

 3
imposed effluent limitations, required flow to be monitored and reported, and included additional

reporting, notice, monitoring, testing, and record-keeping requirements. In its application, DRCP

sought to add certain mining areas and make a boundary change; remove some outfalls; maintain

certain current outfalls and add new outfalls for discharging stormwater, wastewater, and mine

seepage; and allow water in ponds to be used for dust suppression.

 TCEQ’s Executive Director declared the application complete in January 2014. In

February 2015, TCEQ referred the application to the State Office of Administrative Hearings

(SOAH) to be heard by two administrative law judges (ALJs) on DRCP’s request. The Permit

Contestants were admitted as parties, and a four day contested case hearing occurred in November

2015. As relevant to this appeal, the following five issues were discussed at the hearing: (1) whether

DRCP’s contractor CRF should have applied as the permit operator, (2) whether TCEQ properly

conducted its antidegradation review, (3) whether water quality based effluent limits for aluminum

and boron should be imposed in the permit, (4) whether chronic effluent limits are needed at certain

outfalls, and (5) whether TCEQ, by approving the draft permit, was thereby approving an illegal

discharge route on private property not owned or controlled by DRCP.

 In April 2016, the ALJs issued a proposal for decision (PFD), recommending that the

draft permit be granted with a few changes, including “the addition of a boron limit and a

requirement that aluminum be monitored.” After considering the PFD, TCEQ issued a July 2016

final order granting DRCP’s application. But in the final order, TCEQ deleted the ALJ’s

recommended findings on the boron limit and aluminum monitoring requirement and instead added

what it called Other Requirement No. 10 that imposed “a robust and meaningful sampling regime”

 4
that “would occur periodically over the life of the permit to ensure that the effluent limits and

monitoring requirements in the permit reflect the continuing water quality at the site.” See Tex.

Gov’t Code § 2003.047(m) (permitting amendment of PFD).

 The Permit Contestants appealed the issues described above to the Travis County

district court, adding as an issue that TCEQ improperly modified the PFD by deleting the boron limit

and aluminum monitoring requirement. See id. § 2001.171 (providing for judicial review). The

district court reversed TCEQ’s final order and remanded “because the agency’s determination

regarding the proper entity to be identified as the operator of the Mine was made in violation of

statutory and regulatory provisions, was not reasonably supported by substantial evidence

considering the reliable and probative evidence in the record as a whole, and was arbitrary and

capricious,” but affirmed TCEQ’s order “with respect to the other issues on appeal.” See generally

id. § 2001.174 (providing that reviewing court may affirm in whole or in part or reverse or remand

for further proceedings). All parties now appeal to this Court. See id. § 2001.901(a) (providing for

appeal from final district court judgment).

 II. STANDARD OF REVIEW

 Our review of TCEQ’s final order is governed by section 2001.174 of the Texas

Administrative Procedure Act. See id. § 2001.174. This standard requires that we reverse or remand

a case for further proceedings “if substantial rights of the appellant have been prejudiced because

the administrative findings, inferences, conclusions, or decisions” (A) violate constitutional or

statutory provisions, (B) exceed the agency’s statutory authority, (C) were made through unlawful

procedure, (D) are affected by other error of law, (E) are not reasonably supported by substantial

 5
evidence considering the reliable and probative evidence in the record as a whole; or (F) are arbitrary

or capricious or characterized by abuse of discretion of clearly unwarranted exercise of discretion.

Id. § 2001.174(2)(A)–(F).

 As to questions committed to agency discretion, a court may not substitute its own

judgment for the agency’s judgment on the weight of the evidence. Id. § 2001.174. Essentially, this

is a rational basis test to determine, as a matter of law, whether there is a reasonable basis in the

record for the agency’s action. Jenkins v. Crosby Indep. Sch. Dist., 537 S.W.3d 142, 149 (Tex.

App.—Austin 2017, no pet.) (citing Texas Health Facilities Comm’n v. Charter Med.-Dall., Inc.,

665 S.W.2d 446, 452–53 (Tex. 1984)). We therefore are not concerned with the correctness of the

agency’s decision, but its reasonableness, and we apply this analysis without deference to the district

court’s judgment. Id. (citing Sanchez v. Texas State Bd. of Med. Exam’rs, 229 S.W.3d 498, 510–11

(Tex. App.—Austin 2007, no pet.); Texas Dep’t of Pub. Safety v. Alford, 209 S.W.3d 101, 103 (Tex.

2006) (per curiam)).

 A substantial evidence review of an agency’s final decision or action involves the

following two component inquiries:

 (1) whether the agency made findings of underlying facts that logically support the
 ultimate facts and legal conclusions establishing the legal authority for the agency’s
 decision or action and, in turn, (2) whether the findings of underlying fact are
 reasonably supported by the evidence.

Id. The first inquiry may entail questions of law that we review de novo. Id. at 150. On the other

hand, the second inquiry is highly deferential to the agency’s determination—the evidence may even

preponderate against the agency’s finding—and it requires only “such relevant evidence as a

 6
reasonable mind might accept as adequate to support a [finding] of fact.” Id. at 149 (quoting Slay

v. Texas Comm’n on Envtl. Quality, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied)).

In other words, it requires “only more than a mere scintilla, to support an agency’s determination.”

City of Dallas v. Stewart, 361 S.W.3d 562, 566 (Tex. 2012) (quoting Montgomery Indep. Sch. Dist.

v. Davis, 34 S.W.3d 559, 566 (Tex. 2000)). “We presume that the agency’s findings, inferences,

conclusions, and decisions are supported by substantial evidence, and the burden is on the contestant

to demonstrate otherwise.” Jenkins, 537 S.W.3d at 149 (citing Charter Med.-Dall., 665 S.W.2d

at 453).

 The arbitrary and capricious standard and the substantial evidence standard have, at

times, “been considered two sides of the same coin.” Charter Med.-Dall., 665 S.W.2d at 454. Yet,

our case law has drawn demarcations between these standards, see id., and we have identified

instances in which an action may be arbitrary and capricious even if substantial evidence supports

the agency’s order—e.g., “if a denial of due process has prejudiced the litigant’s rights or if the

agency has improperly based its decision on non-statutory criteria” or “if it is based on legally

irrelevant factors or if legally relevant factors were not considered or if the agency reached an

unreasonable result,” Texas Dep’t of Ins. v. State Farm Lloyds, 260 S.W.3d 233, 245 (Tex.

App.—Austin 2008, no pet.); see Public Util. Comm’n v. Gulf States Utils., Co., 809 S.W.2d 201,

207 (Tex. 1991) (“[I]f the Commission has failed to follow the clear, unambiguous language of its

own regulation, we must reverse its action as arbitrary and capricious.”).

 With these standards in mind, we turn to the parties’ dispute.

 7
 III. DISCUSSION

 The parties present five issues in this appeal. DRCP and TCEQ appeal the operator

issue. On cross appeal, the Permit Contestants raise the antidegradation and improper modification

of the PFD issues. The Downstream Landowners, but not the County, additionally raise the chronic

effluent limits and illegal discharge route issues. We first consider DRCP and TCEQ’s operator

issue. Overruling DRCP and TCEQ’s issue, we affirm the district court’s order reversing TCEQ’s

final order. Because we affirm the reversal and conclude that the TPDES permit application was

incomplete, we do not address the remaining four issues.

 In their first and only issue, DRCP and TCEQ challenge the district court’s reversal

of TCEQ’s determinations that DRCP is the owner and operator for purposes of submitting an

application and that the TPDES permit application was complete. See 30 Tex. Admin. Code

§ 305.43(a) (Who Applies) (noting that “it is the duty of the operator and the owner to submit an

application for a [TPDES] permit”). The Permit Contestants argue that CRF, not DRCP, is the

operator, and we agree. To provide context for this issue, we first review the applicable law related

to the TPDES permit application process before turning to the merits of DRCP’s and

TCEQ’s arguments.

The TPDES Application Process

 “The national pollutant discharge elimination system (NPDES) [33 U.S.C. § 1342],

as delegated to the State of Texas, requires permits for the discharge of pollutants from any point

source to waters in the state.” Id. § 305.1(b). Under this delegated authority, TCEQ may issue

“permits and amendments to permits for the discharge of waste or pollutants into or adjacent to water

 8
in the state,” and the discharge of industrial waste into or adjacent to any water in the state must be

authorized by TCEQ. Tex. Water Code §§ 26.027(a), .121. “Such permits are designated as Texas

pollutant discharge elimination system (TPDES).” 30 Tex. Admin. Code § 305.1(b).

 “A person desiring to obtain a permit or to amend a permit shall submit an application

to the commission containing all information reasonably required by the commission.” Tex. Water

Code § 26.027(b). And “it is the duty of the operator and the owner to submit an application for a

[TPDES] permit.” 30 Tex. Admin. Code § 305.43(a).5 Additionally, federal regulations require that

 5
 When the Texas Water Commission promulgated the predecessor to rule 305.43, it stated
that in general it is the duty of the owner of a facility to submit an application for a permit, but
for solid and hazardous waste permit applications, it may be the duty of the operator to
submit an application where the facility is owned by one person and operated by another. See
12 Tex. Reg. 1326, 1330 (1987), adopted by 12 Tex. Reg. 2102, 2103 (1987) (originally codified at
31 Tex. Admin. Code § 305.43). In 1990, the Texas Water Commission promulgated an amendment
that added the requirement that both owner and operator apply for all TPDES permit applications.
See 15 Tex. Reg. 4180, 4183–84 (1990), adopted by 15 Tex. Reg. 5492, 5493 (1990) (amending
31 Tex. Admin. Code § 305.43). In adopting the amendment to the rule, the Texas Water
Commission responded as follows to a commentator’s complaint that this places a burden on the
owner that is inconsistent with federal NPDES and state hazardous waste regulations that only
require the operator to apply for a permit:

 Commission rules have heretofore required that the owner of a wastewater treatment
 facility apply for a permit. Unlike major NPDES and solid and hazardous waste
 facilities, many small wastewater treatment plants do not have a long-term contract
 with an operator. Furthermore, a plant owner is the party with the legal authority to
 authorize entry (for inspections) and empowered to make improvements to assure
 permit compliance. Although it is the commission’s position that these are sufficient
 justifications to require an owner to apply for a permit, the commission must satisfy
 the EPA’s equivalency requirement. Requiring both a plant owner and operator to
 apply for a permit assures enforceability of commission regulations against plant
 owners, and at the same time incorporates the EPA requirement of operator as
 permittee.

15 Tex. Reg. at 5493.

 9
when a facility or activity is owned by one person and operated by another, “it is the operator’s duty

to obtain a permit.” 40 C.F.R. § 122.21(b).6 State programs like the TPDES must conform with this

requirement, although states are not precluded from imposing more stringent requirements. See id.

§ 123.25(a)(4).

 Here, the parties do not dispute that DRCP, the only applicant, is the owner. But they

do dispute whether DRCP or CRF—the contracted miner—is the operator for purposes of rule

305.43(a). If CRF is the “operator” for purposes of chapter 305, then CRF would be required under

rule 305.43(a) to have submitted an application for a TPDES permit. We therefore first turn to the

meaning of “operator” for purposes of chapter 305 and then examine TCEQ’s determination that

DRCP, not CRF, is the operator for purposes of chapter 305. We conclude that according to the

plain language meaning of the regulatory definition for “operator,” CRF and not DRCP is the

operator for purposes of rule 305.43(a).

The Meaning of “Operator”

 We interpret administrative rules, like statutes, under traditional principles of

statutory construction. See TGS-NOPEC Geophysical Co. v. Combs, 340 S.W.3d 432, 438 (Tex.

 6
 The federal regulations do not specifically define “operator” as distinct from “owner”;
rather, a definition is provided for “owner or operator,” which “means the owner or operator of any
‘facility or activity’ subject to regulation under the NPDES program.” 40 C.F.R. § 122.2; see
West Va. Highlands Conservancy, Inc. v. Huffman, 588 F. Supp. 2d 678, 691 (N.D. W. Va. 2009)
(describing this definition as “somewhat circular”), aff’d, 625 F.3d 159 (4th Cir. 2010). But in
initially adopting the rule requiring the operator to obtain a permit, EPA stated that “EPA intends
the person with operational control over the facility to be the one required to submit a permit
application.” Consolidated Permit Regulations, 45 Fed. Reg. 33290, 33299 (May 19, 1980) (codified
at 40 C.F.R. pts. 122, 123, 124, and 125).

 10
2011) (citing Rodriguez v. Service Lloyds Ins., 997 S.W.2d 248, 254 (Tex. 1999)). Our primary

objective in both statutory and rule construction is to ascertain and give effect to the drafters’ intent.

AEP Tex. Commercial & Indus. Retail Ltd. P’ship v. Public Util. Comm’n., 436 S.W.3d 890, 906

(Tex. App.—Austin 2014, no pet.) (citing TGS-NOPEC, 340 S.W.3d at 439). “We determine that

intent from the plain meaning of the words chosen when it is possible to do so, using any definitions

provided.” Id. (citing TGS-NOPEC, 340 S.W.3d at 439). If there is vagueness, ambiguity, or room

for policy determination in the regulation, “we normally defer to the agency’s interpretation unless

it is plainly erroneous or inconsistent” with the rule’s language. TGS-NOPEC, 340 S.W.3d at 438.

But “[w]e defer only to the extent that the agency’s interpretation is reasonable, and no deference

is due where an agency’s interpretation fails to follow the clear, unambiguous language of its own

regulations.” Id.

 Chapter 305 expressly defines “operator” as “[t]he person responsible for the overall

operation of a facility.” 30 Tex. Admin. Code § 305.2(24) (Definitions). Fundamentally, the parties’

dispute is over the meaning of this regulatory definition of operator. DRCP and TCEQ argue that

although CRF performs the day-to-day activities at the mine, CRF is not the “operator” for purposes

of rule 305.43(a) and as defined by rule 305.2(24) because it does not have overall responsibility for

the mine’s operation; DRCP has overall financial responsibility and through its financial

responsibility, control over the operations. In other words, as TCEQ argues, “DRCP, which owned,

was integrally involved in, established the expectations for, and had overall financial responsibility

for the mine, was its ‘operator.’” In contrast, the Permit Contestants respond that CRF is the

operator because it is “the entity that, through dint of its own efforts, controls the day-to-day tasks

 11
and decisions that make the facility function; it is the entity that manages and conducts pollution-

related activities and would be in a position to quickly take action, were something to go wrong.”

 We have already determined the plain meaning of “[t]he person responsible for the

overall operation of a facility,” and see no need to depart from our previous plain meaning

construction of the regulatory definition of “operator” in rule 305.2(24). In Heritage on the San

Gabriel Homeowners Ass’n v. TCEQ, we determined that the plain meaning of rule 305.2(24)’s

definition of “operator” is “the entity responsible for its personal performance of causing the [the

facility] to function.” 393 S.W.3d 417, 430 (Tex. App.—Austin 2012, pet. denied). There, the

Heritage permit contestants—the Hutto landowners—challenged TCEQ’s decision to grant a permit

to Williamson County to expand one of its landfills, which Waste Management of Texas, Inc., had

operated under contract since 1987. Id. at 422. One of the issues raised in that case concerned

TCEQ’s conclusion of law that “Waste Management’s submission of the application on

[Williamson] County’s behalf comported with the rule [305.43(b)],” a different subsection of the

same rule at issue in the present case. Id. at 430. Rule 305.43(b) provided that “it is the duty of the

owner of a facility to submit an application for a permit . . . unless a facility is owned by one person

and operated by another, in which case it is the duty of the operator to submit an application for a

permit.” Id. at 429–30 (quoting 30 Tex. Admin. Code § 305.43(b) (2004)). The Hutto landowners

claimed that Waste Management’s submission of the permit application on Williamson County’s

behalf violated TCEQ’s rule that the “operator” submit the application. Id. at 429. The Hutto

landowners argued that “Waste Management cannot be the ‘operator’ under chapter 305 because

 12
[Williamson] County retains responsibility for the overall operation of the landfill as owner and

permit holder.” Id. at 430.

 In determining whether Waste Management was an “operator” under chapter 305, we

first determined if rule 305.43(b) is ambiguous as to what “operator” means. Id. We turned to the

applicable regulatory definition of “operator” for chapter 305—the same regulatory definition at

issue in the current appeal—which defines “operator” as “[t]he person responsible for the overall

operation of a facility.” Id. (quoting 30 Tex. Admin. Code § 305.2(24)). Relying on dictionary

definitions, we determined that “the plain meaning of TCEQ’s definition of ‘operator’ is the entity

responsible for its personal performance of causing the landfill [i.e., the facility] to function.” Id.

We therefore concluded that rule 305.43(b) is unambiguous, Waste Management was an operator

for purposes of rule 305.43(b) given the plain meaning of rule 305.2(24)’s definition, and,

accordingly, “TCEQ properly concluded that Waste Management’s submission of the application

on [Williamson] County’s behalf comported with the rule.” Id.

 TCEQ argues here that “[t]he [Heritage] Court did not write about [rule] 305.43(a)

and any interpretation of [rule] 305.43(b) was dicta.” As to the second point, we disagree with

TCEQ that our interpretation of rule 305.43(b) relying on the plain meaning interpretation of rule

305.2(24) in Heritage was dicta when that interpretation was necessary to this Court’s determination

that “rule 305.43(b) is unambiguous” and that “TCEQ properly concluded that Waste Management’s

submission of the application [as the operator] on [Williamson] County’s behalf comported with []

rule [305.43(b)].” Id. (considering whether Waste Management can “be the ‘operator’ under chapter

305” for purposes of complying with rule 305.43(b) when “[Williamson] County retains

 13
responsibility for the overall operation of the landfill as owner and permit holder”).7 As to the first

point, although TCEQ is correct that the Heritage Court did not write about rule 305.43(a), the

Heritage Court did expressly address the plain meaning of the regulatory definition of “operator”

as found in rule 305.2(24) in interpreting rule 305.43(b).8 And the definition of “operator” in rule

305.2(24) applies to all the subsections of rule 305.43. See 30 Tex. Admin. Code § 305.2 (“The

following words and terms, when used in this chapter, have the following meanings.” (emphasis

added)). The plain meaning of TCEQ’s definition of “operator” in rule 305.2(24)—described in

Heritage as “the entity responsible for its personal performance of causing the [facility] to

function”—is just as applicable to the meaning of the term “operator” in subsection (a) as it is in

subsection (b) of rule 305.43. See RSUI Indem. Co. v. The Lynd Co., 466 S.W.3d 113, 126 (Tex.

 7
 The Texas Supreme Court has defined dicta as follows: “An opinion expressed by a court,
but which, not being necessarily involved in the case, lacks the force of an adjudication; . . . an
opinion of a judge which does not embody the resolution or determination of the court, and made
without argument, or full consideration of the point.” Seger v. Yorkshire Ins., 503 S.W.3d 388, 399
(Tex. 2016) (quoting Grigsby v. Reib, 153 S.W. 1124, 1126 (Tex. 1913)). In Heritage on the San
Gabriel Homeowners Ass’n v. TCEQ, the Hutto landowners expressly raised the issue of the
meaning of “operator” before this Court, and our determination thereby had the force of an
adjudication. See 393 S.W.3d 417, 425 (Tex. App.—Austin 2012, pet. denied) (“Similarly, [the
Hutto landowners] argue that Waste Management should not have applied for the permit on the
County’s behalf because it is not the ‘operator’ of the landfill as defined in chapter 305 of title 30
of the administrative code.”). And the unanimous panel issued a published opinion embodying the
Court’s resolution of the Hutto landowner’s issue, concluding that “TCEQ properly concluded that
Waste Management’s submission of the application on the County’s behalf comported with [] rule
[305.43(b)].” Id. at 430.
 8
 In Heritage, this Court also discussed the plain language meaning of “operator” as used in
the Solid Waste Disposal Act and chapter 330 of title 30, in contrast to the meaning of “operator”
in chapter 305 of title 30. Id. at 426–29 (citing Tex. Health & Safety Code § 361.087(1); 30 Tex.
Admin. Code § 330.2(91) (2004) (Definitions)). We agree with DRCP and TCEQ that this portion
of the Heritage analysis is largely irrelevant to the meaning of “operator” in chapter 305 when the
term is expressly defined. See 30 Tex. Admin. Code § 305.2(24) (defining “operator” for
chapter 305).

 14
2015) (“Generally, the law recognizes ‘a natural presumption that identical words used in different

parts of the same act are intended to have the same meaning.’” (quoting Atlantic Cleaners & Dyers

v. United States, 286 U.S. 427, 433 (1932))); Sheshunoff v. Sheshunoff, 172 S.W.3d 686, 692 (Tex.

App.—Austin 2005, pet. denied) (noting that courts presume that same terms used in same

connection in different statutes have same meaning); see also Rodriguez, 997 S.W.2d at 254 (“We

construe administrative rules, which have the same force as statutes, in the same manner as

statutes.”). Here, we see no reason to apply the plain meaning of rule 305.2(24)’s definition of

“operator” to interpret the term “operator” in one subsection of a rule—as we did in Heritage—but

not to interpret the term “operator” in another subsection of the very same rule, as DRCP and TCEQ

ask us to do by suggesting that we stray from our decision in Heritage.

 DRCP and TCEQ also ask this Court to give deference to the agency’s interpretation

of “operator.” See Cities of Dickinson, Friendswood, La Marque, League City, Lewisville & Texas

City v. Public Util. Comm’n, 284 S.W.3d 449, 452 (Tex. App.—Austin 2009, no pet.) (“When

construing administrative rules, ‘[a]n administrative agency’s interpretation of its own rules is

entitled to great weight and deference; it controls unless plainly erroneous or inconsistent with the

agency’s enabling statute.’” (quoting Ackerson v. Clarendon Nat’l Ins., 168 S.W.3d 273, 275 (Tex.

App.—Austin 2005, pet. denied))). To the extent that TCEQ is interpreting its regulatory definition

of “operator” as merely the person with “overall financial responsibility”—as its TPDES application

instructions state9—we conclude that this interpretation is inconsistent with the plain meaning of rule

 9
 In an interrogatory response admitted into evidence, TCEQ’s Executive Director stated:

 [DRCP] did not identify [CRF] as a co-applicant in its application. According to the

 15
305.2(24)’s definition of “operator” as we enunciated it in Heritage, 393 S.W.3d at 429–30, and

accordingly is not entitled to deference, see TGS-NOPEC, 340 S.W.3d at 438 (“[N]o deference is

due where an agency’s interpretation fails to follow the clear, unambiguous language of its own

regulations.”); Gulf States Utils., 809 S.W.2d at 207 (holding that “Commission acted arbitrarily in

adopting an interpretation [of its regulation] contrary to the plain language of its regulation”). TCEQ

also argues:

 In this matter, the TCEQ made a formal interpretation of its own rules after a
 contested case hearing. While CRF was the contract operator physically operating
 the mine and bearing some of the operational responsibility, it was reasonable for the
 Commission to interpret Rules 305.43(a) and 305.2(24) to mean that DRCP, which
 owned, was integrally involved in, established the expectations for, and had overall
 financial responsibility for the mine, was its “operator”—the entity “responsible for
 the overall operation of the facility” as that term is used in its rules.

However, this argument appears to be not an agency’s construction of its rule that is entitled to

deference,10 but an argument that substantial evidence supported TCEQ’s conclusion that DRCP is

the “operator.” See Heritage, 393 S.W.3d at 424 (recognizing that courts review “reliable and

probative evidence in the record as a whole when testing an agency’s . . . conclusions, and decisions

 industrial permit application instructions, a facility operator has to be a co-permittee
 when it has overall financial responsibility of the facility operations. Because
 [DRCP] did not list [CRF] as a coapplicant, as far as the [Executive Director] is
 aware, [CRF] is not a facility operator who has overall financial responsibility of the
 facility operations.

The application instructions state: “For TPDES permits, whoever has overall financial responsibility
for the operation of the facility must submit the application for a permit as a co-permittee with the
facility owner.”
 10
 As DRCP notes in its briefing before this Court, “In its Order, TCEQ did not state how
exactly it interprets ‘overall responsibility,’ to the extent any further interpretation is required.”

 16
to determine whether they are reasonably supported by substantial evidence”); see also Tex. Gov’t

Code § 2001.174(2)(E) (same). It is to this argument that we turn next.

TCEQ’s “Operator” Determination

 With the plain meaning of rule 305.2(24)’s regulatory definition of “operator” in

mind, we turn to TCEQ’s conclusion that DRCP and not CRF is the “operator” for purposes of rule

305.43(a)—i.e., whether DRCP and not CRF is “the entity responsible for its personal performance

of causing the [Mine] to function.” Heritage, 393 S.W.3d at 430. In its final order, TCEQ entered

a conclusion of law that “DRCP is the proper permittee as both the owner and operator of the Eagle

Pass Mine,” with findings of fact that emphasize DRCP’s financial responsibility and financial

control.11 Although these findings of fact logically support the conclusion that DRCP has overall

financial responsibility of the Mine, under Heritage, overall financial responsibility alone is

 11
 The relevant findings of fact are:

 40. Based on the Contract Mining Agreement signed by Mr. Gonzalez-Saravia Coss,
 DRCP is solely responsible for the acquisition and maintenance of all interests and
 rights in real property and the reserves, provides its requirements and expectations
 to CRF, approves every plan and budget prior to the incurrence of any costs by CRF,
 pays all actual costs during design and construction of the Eagle Pass Mine, pays all
 operation costs during production at the Eagle Pass Mine, and is required to retain
 and maintain all permits.

 41. DRCP has an office in Eagle Pass, and a DRCP representative visits the site on
 a daily basis to oversee all the functions for which it has responsibility.

 42. DRCP has ownership and control of mine operations, including activities subject
 to the TPDES permit; has responsibility over permit compliance, including the
 TPDES permit; is integrally involved in the activities at the Eagle Pass Mine; and has
 financial responsibility over the operations at the Eagle Pass Mine.

 17
insufficient to support a conclusion that DRCP is the operator. An entity’s overall financial

responsibility is not, on its own, responsibility for its personal performance of causing the Mine to

function. See id.

 Moreover, even if TCEQ had made findings of fact that logically supported the

conclusion that DRCP was responsible for its personal performance of causing the Mine to function,

we would nevertheless conclude that on this record those facts are not reasonably supported by

evidence. DRCP and TCEQ primarily rely on and direct this Court’s attention to the testimony of

Andres Gonzalez-Saravia Coss, the president of the general partnerships that make up DRCP, to

support TCEQ’s conclusion that DRCP and not CRF is the operator for purposes of chapter 305.

However, Coss’s testimony focused on DRCP’s financial responsibility over the Mine; as he stated,

“through its financial control, DRCP maintains oversight of CRF’s operations.”12 (Emphasis

added.) But this is not evidence that DRPC “is the entity responsible for its personal performance

 12
 The relevant sections of Coss’s pre-filed direct testimony were in response to the
following questions: “Please explain the relationship between DRCP and [CRF] with regards to the
Eagle Pass Mine”; “Can you please explain how DRCP is financially responsible for the operations
of the Eagle Pass Mine?”; “How does DRCP maintain oversight of [CRF] operations of the Eagle
Pass Mine?”; and “Does [DRCP] have overall financial responsibility for the operations of the Eagle
Pass Mine?” Each of these sections focused on financial responsibility, not DRCP’s responsibility
for its personal performance of causing the Mine to function. For example, Coss testified that DRCP
maintains oversight of the operations because “DRCP is the financially responsible party, and,
through its financial control, DRCP maintains oversight of CRF’s operations. DRCP must approve
CRF’s mine plan, the budget, and all capital expenses before CRF may incur those expenses. By
doing so, DRCP oversees the operations of the mine.” In explaining how DRCP is financially
responsible for the operations, Coss testified that “the Contract Mining Agreement sets up DRCP’s
financial responsibility for the operations of the Eagle Pass Mine. DRCP provides its requirements
and expectations to CRF. For example, this could relate to amount of coal required. Based on these
requirements, CRF develops a mine plan in which it describes the necessary steps to comply with
DRCP’s expectations. . . . DRCP must, however, approve the plan and budget prior to the
incurrence of any costs by CRF.”

 18
of causing the [Mine] to function.” Id. (emphasis added). Coss’s testimony does not provide

substantial evidence that DRCP is the operator pursuant to the plain meaning of rule 305.2(24). See

30 Tex. Admin. Code § 305.2(24); Heritage, 393 S.W.3d at 430.

 Additionally, the Contract Mining Agreement (the Contract) between DRCP and CRF

shows that CRF, not DRCP, is responsible for the personal performance of causing the Mine to

function. The Contract defines DRCP as the “Owner” and CRF as the “Contractor.” The preamble

states that “Owner owns or controls . . . certain coal reserves and certain real property located near

Eagle Pass”; “Owner is dependent upon coal from the Mine to meet certain coal supply

commitments”; and “Owner desires to engage Contractor to develop, construct, operate and perform

on-going reclamation at the Mine and to remove and deliver coal from the Mine to Owner on the

terms and conditions herein provided.” The Contract thus provides that “Contractor and Owner

agree that Contractor shall develop, construct, operate and perform on-going reclamation at the Mine

and remove and deliver coal from the Mine to Owner upon the terms and conditions set forth in this

Agreement,” which Contractor shall do using “reasonable best efforts.”13 “During the Construction

Period and the Production Period, Contractor shall perform all Work related to on-going reclamation

that is required to comply with all applicable Legal Requirements.” Although “Contractor shall

consult with and keep Owner informed of the progress,” it is “Contractor [that] shall perform all

Work including, but not limited to the development, management and operation of the Mine.”

 13
 Although the term of the contract is redacted, the Contract defines “Initial Term” as
starting on the Contract’s execution and delivery date and ending on December 31, 2012. And,
“Contractor shall be available to operate the facilities up to twenty-four (24) hours per Day, three
hundred and sixty-five (365) Days per year (and three hundred and sixty-six (366) Days during a
leap year).”

 19
 As to permits, the Owner shall “retain and maintain in its name the Surface Mining

Permit and all other permits . . . except for those that must be obtained in the name of Contractor.”

(Emphasis added.) To the extent permitted by law, “Owner hereby irrevocably for the term of this

Agreement grants to Contractor the right to operate under the Surface Mining Permit and other

permits now or hereafter issued to Owner.” And “Contractor shall pay all fines and penalties payable

directly by Contractor to any Governmental Authorities, including, without limitation, MSHA, EPA,

RCT, or TCEQ” (emphasis omitted), except when the fine or penalty relates to either a specific

expenditure requested by CRF and denied by DRCP or a disputed matter that was considered by an

independent engineer review pursuant to a specific provision of the Contract. The Contract also

provides that “Contractor assumes full responsibility for security of the Mine site.”

 Further, the Contract provides that it is Contractor that has responsibility for the

overall operations of the Mine during Contractor’s personal performance of causing the Mine to

function. Importantly, Contractor, not Owner, “shall employ a Mine manager at the Mine who is

responsible for the overall operation of the Mine in accordance with this Agreement.” (Emphasis

added.) Additionally, “Contractor shall (and shall cause its Subcontractors, if any, to) comply with

all applicable Legal Requirements, including all applicable environmental . . . rules and regulations

of Governmental Authorities, including . . . TCEQ.” And while “Contractor is an independent

contractor” and “shall employ, direct, control, manage, supervise, discharge and pay its own

employees,” the “Owner shall have no control of or supervision over any such employees or over

any contractors, Subcontractors or anyone else hired by Contractor.” The “Employees and

Subcontractors of Contractor engaged in the mining are solely the employees and Subcontractors of

 20
Contractor.” And “Owner, in the exercise of its right of access and inspection or otherwise, shall

have no right to issue instructions to, make demands of or direct in any way the daily work and daily

activities of Contractor’s employees unless to remedy an Emergency, which shall be a right of

Owner, but not an obligation of the Owner.” (Emphasis added.)

 DRCP’s witness Peter Nielsen, the president of CRF, testified as to the

responsibilities of DRCP and CRF. He stated that he has “overall responsibility for the design,

construction, and operation of the Eagle Pass Mine.” Although he reaffirmed that “DRCP has

overall financial responsibility over the operations,” he described CRF’s role as “generally

responsible for all planning and engineering, equipment selection and for the overall construction

and operation of the mine.” Nielsen did testify that DRCP has an office in Eagle Pass and “visit[s]

the site daily,” although DRCP does not have “somebody there 100 percent of the time.” Nielsen

did not testify as to the purpose of the site visits and the Contract demonstrates that DRCP does not

have the right to direct the daily work on site visits unless to remedy an emergency and that it is

CRF, not DRCP, that employs a Mine manager who is responsible for the overall operation of

the Mine.

 Nielsen also testified that “[a]s President of CRF, I hold overall responsibility for

compliance for all permits issued for the operation of the mine” and that his environmental

department “will perform all monitoring and reporting requirements under the [draft TPDES]

permit.” He testified that CRF would make the decision regarding whether to discharge wastewater

from sedimentation ponds. On cross examination at the hearing he testified that although DRCP has

overall financial responsibility, CRF has overall responsibility over the operations.

 21
 In sum, although substantial evidence may exist that DRCP has overall financial

responsibility of the Mine, DRCP’s overall financial responsibility alone is insufficient to support

a conclusion that DRCP is the operator for purposes of rule 305.43(a). And, “considering the

reliable and probative evidence in the record as a whole,” Tex. Gov’t Code § 2001.174(2)(E),

substantial evidence does not reasonably support the conclusion that DRCP and not CRF is the

operator according to the plain meaning of rule 305.2(24)’s definition of “operator”—i.e., the entity

responsible for its personal performance of causing the Mine to function, see Heritage, 393 S.W.3d

at 430. Because substantial evidence does not support the conclusion that DRCP is the operator of

the Mine for purposes of rules 305.43(a) and 305.2(24), DRCP’s permit application violated

applicable statutes and regulations regarding the duty of the operator to submit an application and

obtain a permit. See Tex. Water Code § 26.027(b) (“A person desiring to obtain a permit or to

amend a permit shall submit an application to the commission containing all information reasonably

required by the commission.”); 40 C.F.R. § 122.21(b) (“[I]t is the operator’s duty to obtain a

permit.”); 30 Tex. Admin. Code § 305.43(a) (“[I]t is the duty of the operator and the owner to submit

an application for a [TPDES] permit.”); see also Tex. Gov’t Code § 2001.174(2)(A) (providing for

reversal when statutory provisions are violated).14

 Additionally, the Permit Contestants complain that their substantial rights were

prejudiced. See Tex. Gov’t Code § 2001.174(2) (requiring substantial rights of appellant to have

 14
 The district court, in its order, stated that “the Court hereby REVERSES the TCEQ’s Final
Order, because the agency’s determination regarding the proper entity to be identified as the operator
of the Eagle Pass Mine was made in violation of statutory and regulatory provisions . . . .” However,
section 2001.174(2)(A) only permits reversal for violations of constitutional and statutory provisions,
not regulatory provisions. Tex. Gov’t Code § 2001.174(2)(A).

 22
been prejudiced for reversal or remand). The Permit Contestants argue that because CRF did not

submit an application as the operator and is not listed as a permittee, the public is “deprive[d] . . .

of notice of the main entity on which the public will be relying for environmental compliance” and

“of knowledge of that entity’s compliance history.”15 See 30 Tex. Admin. Code §§ 39.411(b)(2)

(Text of Public Notice) (requiring public notice of applicant’s information, including its contact

information), 60.1 (Compliance History). Because CRF, as the operator, did not comply with its

duty to submit an application, TCEQ failed to consider the operator’s compliance history as a

required applicant.16 See Tex. Water Code § 5.754(i) (“The commission shall consider the

compliance history of a regulated entity when determining whether to grant the regulated entity’s

application for a permit or permit amendment for any activity under the commission’s jurisdiction

to which this subchapter applies.”); see also 30 Tex. Admin. Code § 60.1. DRCP and TCEQ neither

contested the Permit Contestants’ argument nor challenged the district court’s decision on the ground

that substantial rights would not be prejudiced if CRF was the operator that did not submit a permit

 15
 At oral argument, the County’s counsel also argued:

 The County’s interests in this case springs because the citizens are interested in it, but
 also because the County has enforcement authority under the . . . Texas Water Code
 . . . to enforce TCEQ permits and therefore we would like to have a clear line of
 authority against whom to enforce the permit. . . . If [CRF], what we call the
 operator, is not on that permit, is not on the application, is not on the permit, we are
 going to have a harder time enforcing the TCEQ permit against [CRF] because it is
 not a party to the contract, it is just a subcontractor to the party of the contract.
 16
 In its final order, TCEQ considered DRCP’s compliance history and determined that “[t]he
compliance history of DRCP and the Eagle Pass Mine support approval of DRCP’s Application.”
However, TCEQ did not consider CRF’s compliance history and the ALJ concluded that “CRF’s
compliance history is not relevant” because “CRF is not the applicant or the operator and need not
apply for the permit.”

 23
application. Accordingly, we overrule DRCP and TCEQ’s only issue on appeal and affirm the

district court’s judgment reversing TCEQ’s final order. See Tex. Gov’t Code § 2001.174(2)(A),

(E), (F).17

 The district court’s judgment also affirms TCEQ’s final order “with respect to the

other issues on appeal” raised by the Permit Contestants for judicial review. Having concluded that

the application for the TPDES permit for the Mine was incomplete because CRF as the operator did

not submit an application, we would be issuing an impermissible advisory opinion were we to

address the issues that concern the specific TPDES permit granted by the TCEQ. See Valley Baptist

Med. Ctr. v. Gonzalez, 33 S.W.3d 821, 822 (Tex. 2000) (per curiam) (“Under article II, section 1 of

the Texas Constitution, courts have no jurisdiction to issue advisory opinions.”). The parties do not

explain how we have jurisdiction to address these other issues if we affirm the district court’s

 17
 DRCP argues that the County did not preserve an arbitrary and capricious review because
they did not argue this ground in their motion for rehearing or their briefing before the district court.
See Tex. R. App. P. 33.1. However, the Texas Supreme Court has stated that “if an agency ‘does
not follow the clear, unambiguous language of its own regulation, we reverse its action as arbitrary
and capricious.’” Texas Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC,
324 S.W.3d 95, 104 (Tex. 2010) (quoting Rodriguez v. Service Lloyds Ins., 997 S.W.2d 248, 255
(Tex. 1999)). The County expressly argued in its motion for rehearing that TCEQ “fail[ed] to honor
30 TAC § 305.43(a).” And in its brief before the district court, the County argued that pursuant to
Heritage “the plain meaning of the TCEQ’s definition of ‘operator’ is the entity responsible for its
personal performance of causing the landfill to function,” and that under the proper legal standard,
CRF is the operator. We conclude that this was a sufficiently stated legal basis to allow the agency
to cure any error or defend the order regarding its alleged failure to comply with the language of its
own regulations, and the County thereby preserved the issue for review. See Entergy Gulf States,
Inc. v. Public Util. Comm’n, 173 S.W.3d 199, 210 (Tex. App.—Austin 2005, pet. denied) (“The
motion for rehearing must be sufficiently definite to allow the agency to cure the error or defend the
order. . . . To preserve the issue for review, the party must state in the motion for rehearing the
particular issue the party asserts was error and the legal basis upon which the claim rests.”
(citations omitted)).

 24
reversal as to the operator issue. We therefore vacate that portion of the district court’s final

judgment affirming the other issues on appeal.

 IV. CONCLUSION

 For these reasons, we affirm the district court’s final judgment reversing the TCEQ’s

final order and remanding for further proceedings and vacate the district court’s judgment affirming

the other issues raised on appeal.

 __________________________________________
 Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed in Part; Vacated in Part

Filed: November 15, 2019

 25